**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

**BARBARA JEAN ALLEN,**

              Plaintiff,                    Case No. 3:12-cv-1544-ST

        v.                            **FINDINGS AND RECOMMENDATION**

**CAROLYN L. COLVIN,**[1]
Commissioner of Social Security,

              Defendant.

**STEWART, Magistrate Judge:**

    Plaintiff, Barbara Allen ("Allen"), seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying her applications

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVI of the Social Security Act.  This court has jurisdiction under 42 USC § 405(g)

and § 1383(c).  For the following reasons, the Commissioner's decision that Allen is not disabled

should be reversed, and this case should be remanded for an immediate award of benefits.

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FRCP 25(d), Carolyn W. Colvin should be substituted for Michael J. Astrue as defendant in this case.

## ADMINISTRATIVE HISTORY

Allen filed applications for DIB and SSI on August 18, 2008, alleging disability as of May 1, 2007, due to depression, panic, nervousness, and seizures.  Tr. 144-51, 168.[2]  Her date last insured is March 31, 2008.  Tr. 164.  After the Commissioner denied her applications initially and upon reconsideration (Tr. 82-102), Allen requested a hearing (Tr. 103-05) which was held on November 30, 2010.  Tr. 44-81.  On January 21, 2011, Administrative Law Judge ("ALJ") Riley Atkins issued a decision finding Allen not disabled.  Tr. 21-43.  The Appeals Council denied Allen's subsequent request for review on May 19, 2012 (Tr. 6-8), making the ALJ's decision the final Agency decision.  Allen now seeks judicial review of that decision.

## BACKGROUND

Allen was 37 years old at the time of the hearing.  Tr. 48.  She completed her GED in 1995, worked sporadically for a couple of years as a temporary unskilled laborer and last worked for about 18 months as a cashier and cook at a bowling alley.  Tr. 52, 168-69, 172.  Allen alleges that she stopped working on May 1, 2007, due to increasing depression and seizures.  Tr. 53-54, 168.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

---

[2]  Citations are to the page(s) indicated in the official transcript of the record filed on January 9, 2013 (docket #12).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs

exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this

burden, then the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v)

& (g), 416.960(c).

## **ALJ'S FINDINGS**

At step one, the ALJ found that Allen had not engaged in substantial gainful activity after

the alleged onset date of May 1, 2007.  Tr. 26.  At step two, the ALJ found that Allen's mood

disorder, anxiety disorder, personality disorder, and seizure disorder were severe impairments.

*Id*.  At step three, the ALJ found that Allen did not have an impairment or combination of

impairments that met or medically equaled a listed impairment.  Tr. 27-28.

The ALJ next assessed Allen's residual functional capacity ("RFC") and determined that

she could perform work at all exertional levels, with the following nonexertional limitations: she

is limited to routine, repetitive unskilled work with no public contact; can engage in brief social

interactions with coworkers and supervisors; and should avoid exposure to work place hazards,

such as heights because of a seizure disorder.  Tr. 28.  At step four, the ALJ found Allen could

not perform any of her past relevant work.  Tr. 37.  At step five, based on the testimony of a

vocational expert ("VE"), the ALJ determined that Allen could perform jobs that exist in

significant numbers in the national economy, including medium unskilled work as a dishwasher

and laundry worker.  Tr. 38.  The ALJ therefore concluded that Allen is not disabled.  *Id*.

## **STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if it is based on proper

legal standards and the findings are supported by substantial evidence in the record.  42 USC

§ 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence

that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028,

1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing

court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec.*

*Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir

2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Where the evidence is

susceptible to more than one rational interpretation, the Commissioner's decision must be upheld

if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533

F3d 1035, 1038 (9th Cir 2008), *quoting Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190,

1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## FINDINGS

Allen asserts that the ALJ erred by:  (1) rejecting her subjective testimony; (2) rejecting

the opinion of her examining physician; (3) rejecting the opinions of her mental health treatment

providers; and (4) failing to properly assess her RFC.

**I.    Allen's Credibility**

At the hearing, Allen testified that she collects food stamps from the Temporary

Assistance for Needy Families ("TANF") program.  Tr. 75-76.  She last worked for 18 months as

a short order cook at the bowling alley across from her home.  She primarily "stayed in the back

and cooked" and only occasionally would operate the cash register when the cashier was on

break.  Tr. 52.  Her employer would accompany Allen to and from work and also take her home

when she became overwhelmed and yelled at customers.  Tr. 53-54.  Allen quit that job in April

or May 2007 due to depression, nervousness, and seizures.  Tr. 50, 52-54.  However, she was not

taking her seizure medication at that time because she could not afford it.  Tr. 54.

Allen stays in her apartment, mostly sleeping or watching television.  Tr. 56-57.  Her

children or a friend accompany her to grocery shop and attend doctor appointments.  Tr. 55, 68-

69.  The handful of times she attended church, Allen's sons would go with her or the pastor would come and pick her up.  Tr. 67.  She has "really bad nightmares" (Tr. 56) which increased in frequency and intensity shortly before the hearing.  Tr. 56, 70.  When thinking about leaving the house alone, she gets scared and her "chest starts getting tight [until she] can't breathe . . . ."  Tr. 68.  Her depression causes her to "want to cry and stay in [her] bed" once or twice a week.  Tr. 69.  When she is "really depressed," she does not cook or do any other household chores.  Tr. 70.

At the time of the hearing, Allen was taking Depakote which "sometimes" controlled her seizures.  Tr. 73-74.  She has never been to the hospital for her seizures.  Tr. 74.  She also admitted that she was terminated by her mental health counselor in 2008 because she did not promptly disclose an incident in which she was arrested for aggressive behavior while intoxicated.  Tr. 65-66.

The ALJ found Allen "credible to the extent that she suffers from some type of impairment," but did not find her "allegation that she is incapable of all work activity to be credible as the evidence in the record reflects [her] functional limitations are not as significant and limiting" as alleged.  Tr. 30.  Allen challenges this finding.

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms.  *Vasquez v. Astrue*, 572 F3d 586, 591 (9th Cir 2009).  First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter*, 504 F3d at 1036.  Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

specific, clear and convincing reasons for doing so.'" *Id*, quoting *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). The ALJ's overall credibility determination may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are upheld. *Batson*, 359 F3d at 1197.

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities and work record and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284; *see* SSR 96–7p, *available at* 1996 WL 374186 (July 2, 1996). Further, an ALJ "may consider . . . ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms, . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F3d at 1284.

The ALJ found Allen to suffer from severe mood, anxiety, personality, and seizure disorders, and that these impairments could reasonably be expected to cause her alleged symptoms. Tr. 26, 30. He cited no evidence that Allen is malingering. Thus, under well-established Ninth Circuit authority, the ALJ was required to cite clear and convincing reasons in order to reject Allen's subjective symptom testimony.

In his lengthy decision, the ALJ cited a number of reasons for finding Allen not fully credible. First, he found that Allen's activities of daily living belied her subjective symptom testimony regarding the nature and extent of her limitations. Tr. 30-31. In support, he cited a 2010 treatment note from Allen's counselor that Allen "is able to complete [activities of daily living] independently." Tr. 30, 333. He also cited Allen's own function report, completed when she applied for benefits in 2008, for the proposition that "she is able to take care of her children,

handle her own personal needs and finances, cook simple meals, use public transportation, clean twice a week, shop for food once a week, and do laundry once a week." Tr. 30, 183-85, 276. The ALJ further cited a Third Party Function Report by Allen's friend, Nicki Baker, that Allen performs several of these activities, although with some assistance.  Tr. 30-31, 174-79. Moreover, citing findings by an examining psychologist, Jane Starbird, Ph.D., and Allen's statement that it is her children's job to do the chores (Tr. 276, 278), the ALJ concluded that Allen's alleged inability to do chores "has very little to do with her emotional needs and her physical capabilities, but has a lot to do with her attitude."  Tr. 30.

With regard to the first of the ALJ's reasons, Allen argues that her activities of daily living are not actually inconsistent with her claimed mental health symptoms that frequently prevent her from leaving home unaccompanied, cause frequent nightmares that result in daytime sleepiness, memory impairment, and frequent temper outbursts.  A careful review of the record reveals that the ALJ's citations to the supporting documents tell only part of the story of Allen's symptoms.  The 2010 treatment note from the counselor is an unexplained one-line comment that "Client is able to complete ALDs independently."  Tr. 333.  By not elaborating further as to what activities of daily living Allen can complete, it is scant evidence of contradicting her subjective symptom testimony.  The function reports completed by Allen (Tr. 182-89) and her friend (Tr. 174-81) do state that in September 2008, Allen engaged in some activities, including preparing meals for her children (Tr. 174, 183), grocery shopping (Tr. 177, 185), and cleaning (Tr. 176, 184).  However, the reports clarify that Allen cooked only sandwiches and frozen dinners, went outside only once a week, and needed prompting by her friend or her children to "stay on task and be productive," (Tr. 176; *see also* Tr. 184 (noting that her kids have to prompt her to get out of bed and encourage her to do house work)), as well as reminders from her son to

8 -- FINDINGS AND RECOMMENDATION

take her medications. Tr. 184. Thus, the function reports do not paint as rosy a picture of Allen's functional abilities at that time as the ALJ's summary implies. To the contrary, the same reports indicate that Allen was suffering from nightmares, anxiety, seizures, insomnia, and was spending "all of her time in bed and in her room," other than when she would "get out of bed to go to the bathroom or to [her] doctor." Tr. 179, 182. The information provided in the function reports not only fails to provide a clear and convincing reason to reject Allen's subjective symptom testimony, but actually supports her testimony.

This leaves the psychodiagnostic report completed by Dr. Starbird at the request of SPD/DDS on February 17, 2009. Tr. 273-79. Based on a comment attributed to Allen in that report, the ALJ concluded Allen's alleged inability to do chores "has very little to do with her emotional needs and her physical capabilities, but has a lot to do with her attitude." Tr. 30. However, the ALJ's conclusion conflicts with Dr. Starbird's conclusion that Allen was "quite dependent on others . . . in terms of day to day functioning" and that her "level of dependency in day to day chores . . . is considered to be more related to emotional needs and not related to actual physical capabilities." Tr. 278. Dr. Starbird diagnosed Allen with mood disorder NOS and anxiety disorder NOS (Axis I), borderline personality disorder NOS (Axis II), and seizure disorder and asthma (Axis III). Tr. 278. Although Dr. Starbird found no basis for diagnosing panic disorder (Tr. 277) and found Allen "invested in her self-image as a person who is disabled," she never indicated that Allen's description of her symptoms was out of line with her diagnosis or that she was eschewing chores due to a poor "attitude." In short, while the ALJ does cite Dr. Starbird's report as evidence to reject Allen's testimony, he attributes her symptoms to an "attitude" issue not mentioned or eluded to by Dr. Starbird. As such, Dr. Starbird's report fails to support the ALJ's conclusion.

As a second reason to find Allen not fully credible, the ALJ concluded that her sporadic work history "though not dispositive, does not place [her] credibility in a favorable light." Tr. 31. In support, he pointed to her testimony "to having a temper and having problems with supervisors" and "being able to work as long as she can afford her medication." *Id.* This is a mischaracterization of her testimony. In fact, Allen testified that she sometimes would holler at a customer when she got overwhelmed and scared at work. Tr. 53. If anything, this supports her claim that due to her anxiety, her temper interferes with her work. Allen also testified, contrary to the ALJ's characterization, that even before she stopped taking her medications and suffered seizures, she had problems at work. Tr. 54. The ALJ also noted that Allen relies on her boyfriend, food stamps and TANF and that TANF required her to apply for social security benefits. Tr. 31. If Allen cannot work, then she cannot be blamed for relying on public support and her boyfriend. And even if her application was motivated by the TANF requirements, she may still be disabled. Thus, Allen's sporadic work history is not a clear and convincing reason to cast doubt on Allen's credibility.

As a third reason, the ALJ cited seven "[o]ther inconsistencies appear[ing] throughout the record and the hearing." Tr. 31. However, those alleged inconsistencies simply do not withstand scrutiny.

As the first inconsistency, the ALJ noted that Allen testified "that Depakote controls her seizures but then, quickly corrected herself to say that it only 'sometimes' works." Tr. 31. Rather than being inconsistent, it is clear that Allen was merely explaining her affirmative response, clarifying that Depakote only "sometimes" controls her seizures, but that she still has them. Tr. 73-74. Moreover, the treatment records report the periodic reoccurrence of seizures despite ongoing treatment with Depakote, and the ALJ included seizure precautions in his RFC.

In short, Allen's one sentence explanation is not an inconsistency sufficient to discount Allen's testimony about her subjective symptoms.

As the second and third inconsistencies, the ALJ disputed Allen's claim that her memory is a problem (Tr. 70) because "evidence has shown on at least four occasions that [her] concentration was good and memory tested well and was intact" and because she "reported not needing reminders to take care of her own personal needs but needing reminders to take her medications." Tr. 31. The ALJ's citation to the "four occasions" is questionable. The first occasion is a check mark by the person who received Allen's telephone application for benefits in August 2008 of "no observable/perceived difficulties with concentration" and is hardly persuasive. Tr. 165. The second occasion is a September 2007 intake assessment checking boxes that Allen's memory was "intact" and that her concentration was "adequate," but without any further explanation. Tr. 253. The third occasion is Dr. Starbird's statement that Allen's "[c]oncentration is good," but the ALJ ignored the test results revealing a poor memory and attention. Tr. 276-77. The fourth occasion is an October 2007 initial evaluation finding a "grossly intact" memory, but ignoring the finding of somewhat tangential thought processes. Tr. 428. These entries simply are not inconsistent with Allen's testimony that she sometimes "can't remember things that happened four hours ago" and that her ability to remember and concentrate are worse when she is scared and anxious. Tr. 70. Nor does the ALJ's observation that Allen can take care of her personal needs, but needs reminders to take medications, provide a basis to discount her testimony about a poor memory. Taking medications on a schedule differs qualitatively from attending to personal needs which often involve no set schedule and have built in biological triggers such as hunger (eating) or fatigue (sleeping).

As the fourth inconsistency, the ALJ noted that Allen testified at the November 2010 hearing "that a side effect of her medications is tiredness, but she reported in October 2010 that she had no problems with side effects from her medications." Tr. 31; *compare* Tr. 58 *to* Tr. 383. The difficulty of treating these two statements as an inconsistency indicative of Allen's dubious credibility is the assumption that the medical provider who checked the box on the October 2010 medical chart (Tr. 383) would have deemed tiredness worth noting as evidence of "problems with side effects." Without further information about the nature of the question asked and Allen's response, the check box provides no basis for finding it inconsistent with Allen's testimony at the hearing a few weeks later.

As the fifth and sixth inconsistencies, the ALJ cited findings in Dr. Starbird's report that: (1) Allen "seemed to be invested in her self-image as a person who is disabled" (Tr. 276); and (2) "her credibility is considered questionable as there were contradictions" (Tr. 277). According to the ALJ, the first finding "indicates the claimant is not sincere in trying to improve her condition." Although certainly indicative of Allen's level of dependency, that finding is not an inconsistency that detracts from credibility. The second finding may, as the ALJ found, indicate "contradictions with the claimant's history and symptom descriptions." Tr. 31. Although Dr. Starbird does not specify the contradictions to which she refers, her report indicates that during the examination, Allen reported a "low" mood, then being "fine," reported refusing to consider suicide, but having attempting suicide 10 times, and had an "affect . . . inconsistent with the content of her speech as she described very negative circumstances without the expected level of distress." Tr. 276. None of those contradictions directly contradict any subjective symptom alleged by Allen.

As the last inconsistency, the ALJ cited Allen's testimony "that she only sleeps a few hours per night due to nightmares (Tr. 56), noting that the record shows she reported sleeping seven to eight hours per night, even though she has nightmares." Tr. 31. Allen made the latter report in 2007. Tr. 428. The ALJ ignored Allen's testimony in 2010 that her nightmares had recently worsened. Tr. 70. Thus, her testimony in 2010 was not inconsistent with her 2007 report.

In sum, none of the supposed inconsistencies cited by the ALJ to weaken Allen's credibility are supported by substantial evidence in the record.

Finally, the ALJ found that the symptoms of Allen's impairments were effectively mitigated by treatment. He found that her seizure disorder "appears to be well controlled by medication" and that her mood disorder, anxiety disorder, and borderline personality disorder "wax and wane together depending upon [Allen's] environmental stressors at the time" with "a trend of improvement." Tr. 31, 32. A treatment's effectiveness is relevant to determining the severity of a claimant's symptoms, and the ALJ may rely on evidence of effective treatment in making a negative credibility finding. 20 CFR § 404.1529(c)(3)(iv) & (v); *Tommasetti,* 533 F3d at 1040.

With respect to Allen's seizures, the record shows that due to medication, she did have fewer seizures, but she still experienced them at times when triggered by stress. Tr. 348-83. Although Allen stated that she is able to use public transportation despite her seizures, she also stated that she cannot do so alone. Tr. 185. Therefore, her seizures, although less frequent due to treatment, are nonetheless limiting.

With respect to Allen's mental impairments, the record does not show an absence of symptoms at any point in time due to effective treatment. Instead the notes reveal frequent

reports by Allen of stress, anxiety, depression, and disturbed sleep despite her medications. Tr. 348-83.  Her symptoms may wax and wane depending on environmental stressors, as found by the ALJ, but cannot be said to be effectively well controlled by treatment.

Thus, the ALJ's credibility determination is not adequately supported by substantial evidence in the record.

## II.    <u>Examining Physician's Opinion</u>

Allen also challenges the ALJ's rejection of the opinion of Terri Robinson, M.D. Dr. Robinson examined Allen on January13, 2009, apparently in connection with a complaint of abdominal pain.  Tr. 292-96.  Dr. Robinson opined that Allen had a limited capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, should avoid frequent reaching with her dominant right arm and should avoid "dusty, poorly ventilated environments given the history of asthma."  Tr. 296.  The ALJ gave only "limited weight" to Dr. Robinson's opinion "as the record does not support several of the findings."  Tr. 35.

The ALJ is responsible for resolving conflicts in the medical record, including conflicts among physicians' opinions.  *Carmickle v. Comm'r*, 533 F3d 1155, 1164 (9th Cir 2008).  The Ninth Circuit distinguishes between the opinions of treating, examining, and non-examining physicians.  The opinion of a treating physician is generally accorded greater weight than the opinion of an examining physician, and the opinion of an examining physician is accorded greater weight than the opinion of a non-examining physician.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  An uncontradicted treating physician's opinion can be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F2d 1391, 1396 (9th Cir 1991).  In contrast, if the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion.

*Lester*, 81 F3d at 830.  Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with medical records, inconsistency with a claimant's testimony, and inconsistency with a claimant's daily activities.  *Tommasetti*, 533 F3d at 1040.  An ALJ may also discount a medical source's opinion that is inconsistent with the source's other findings.  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005).

A non-examining physician, Neal E. Berner, M.D., opined on August 20, 2009, that Dr. Robinson's "limitations are unreasonable and not entitled to controlling weight."  Tr. 318. Dr. Berner noted that Allen's examination by Dr. Robinson in January 2009 was "normal," except for her obesity, and that his review of the medical record revealed "no evidence of asthma or other physical impairments."  *Id.*  Based on Dr. Berner's contrary opinion, the ALJ was required to provide specific, legitimate reasons for rejecting Dr. Robinson's opinion.

The ALJ discounted Dr. Robinson's opinion as to Allen's right shoulder limitation because "at best, it was only a temporary limitation."  Tr. 35; *see Carmickle*, 533 F3d at 1165 (the fact that an impairment is temporary is a reason to discount a doctor's limitations related to it).  As support, he noted that Dr. Robinson met with Allen for only 28 minutes and reported a "normal" physical examination with only a "slightly decreased range of motion in her right shoulder joint."  Tr. 35.  Allen takes issue with this characterization as an incorrect lay opinion. Contrary to the ALJ, Allen describes the range of motion in her right shoulder as abnormal and substantially reduced based Dr. Robinson's findings of "decreased abduction to 95 degrees" (compared with 180 degrees on the left), flexion of 110 (versus 180 degrees on the left), extension of 40 degrees (versus 50 degrees on the left), and adduction of 45 degrees (versus 50

degrees on the left.)  Tr. 294.  She also points out that nothing in the record indicates that these abnormalities were temporary or due to a recent injury.

Dr. Robinson's examination reveals that Allen's right shoulder has a lesser range of motion than her left shoulder, especially with respect to abduction and flexion.  Although Dr. Robinson does not explain why, she concluded that this decreased range of motion, whether characterized as slight or substantial, limits Allen to light work and less than frequent reaching with the right arm.  In contrast, Dr. Berner did not examine Allen and made no physical findings contrary to Dr. Robinson, but simply relied on the lack of other supporting evidence in the record.  Tr. 35, 318.

The ALJ parroted Dr. Berner's conclusion by stating that Dr. Robinson's "report failed to show a medical history regarding her right shoulder or that he [*sic*] even asked her any questions in order to discover a cause or find out her level of pain and discomfort.  Moreover, the record showed no history of complaints regarding her right shoulder and the report did not have it listed in her history of present or past illnesses."  Tr. 35.  However, the issue is not whether Allen's shoulder has caused her sufficient pain and discomfort to seek medical attention, but whether it presents exertional limitations based on the range of motion.  Given Allen's limited work history, she may never have exerted herself to the point that her right shoulder caused her any pain and discomfort.[3]  But her lack of complaint does not mean she possesses the physical ability to do more than Dr. Robinson indicates based on her physical examination.  In other words, nothing in the record supported the ALJ's conclusion that the decreased range of motion is only temporary. Given that the opinion of an examining physician carries greater weight than a reviewing physician and that Dr. Robinson was the only examining physician who assessed Allen's

---

[3] At her last job, Allen reported that she did no reaching and frequently lifted 10 pounds.  Tr. 169, 191.

physical capacity for work, the ALJ was required to do more than simply note the lack of any other medical evidence.

Given her obesity, as acknowledged by Dr. Berner (Tr. 318), Allen also takes issue with the ALJ characterizing her physical examination as "normal." At 185 pounds and 63 inches tall as recorded by Dr. Robinson (Tr. 293), she has a Body Mass Index (BMI) of 32.8.[4] A consistent pattern over time of a BMI of 30.0 or more is generally sufficient to indicate the medically determinable impairment of obesity. SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). The regulations recognize that obesity may cause limitations in lifting and carrying. *Id; see also* 20 CFR Part 404, Subpart P, Appendix 1, §§ 1.00Q & 3.001 (adjudicators "must consider any additional and cumulative effects of obesity" on a claimant's RFC). An ALJ "must consider [a claimant's] obesity as a factor contributing to her disability." *Hammock v. Bowen,* 879 F2d 498, 504 (9th Cir 1989). However, Dr. Robinson did not indicate that Allen's obesity limited her physically, and no other medical evidence refers to any limitations based on Allen's obesity. Therefore, the ALJ did not err by referring to a "normal" examination without considering Allen's obesity.

The ALJ also found "no evidence to support the environmental limitations for asthma because, for the reasons discussed above, it is a non-severe impairment." Tr. 35. Under step three, the ALJ found that asthma was not a severe impairment, stating:

> When the diagnosis was mentioned, it was in a psychiatric record without any supporting evidence. There is no mention in the record of a prescription for asthma medication until February 2010, although the claimant does mention using an inhaler in a document dated February 17, 2009. In that document, it was noted that the claimant had an inhaler and it helped. The claimant's prescription was for Proair HFA and was prescribed on an as needed basis. Also, there is no evidence of recurrent attacks or even medical appointments for this condition. Furthermore, she

---

[4] http://www.nhlbi.nih.gov/guidelines/obesity/BMI/bmicalc.htm (last accessed October 7, 2013)

continues to smoke as she has for the last twenty years, supporting the conclusion that the condition is not severe.

Tr. 26-27 (citations omitted).

This finding is based on several factual errors.  Before the diagnosis by Dr. Starbird in February 2009 (Tr. 278), Allen's asthma was diagnosed by Dr. Robinson (Tr. 295) and also mentioned in the medical history by other medical providers (Tr. 254).  In addition, the record shows that Allen had an ongoing prescription for asthma medication Pro-Air since at least January 22, 2008, if not before (Tr. 255).  These errors, however, are harmless because the ALJ provided legally sufficient reasons supported by substantial evidence in the record for finding Allen's asthma to be non-severe.  *See Carmickle*, 533 F3d at 1162 (erroneous basis for an ALJ's determination is harmless error if other valid reasons supporting that determination remain).  As the ALJ correctly stated, the record contains no supporting evidence for any recurrent attacks or medical appointments for asthma, other than to refill prescriptions.  It cannot be ascertained from the record how badly Allen suffered from asthma or what triggered her attacks.  The ALJ also correctly stated that Allen continued to smoke half a pack of cigarettes per day after the alleged onset date.  Tr. 182.  This suggests – and the ALJ rationally concluded – that Allen's asthma was not a serious impairment.

Nonetheless, even if asthma is a non-severe impairment, the ALJ must still consider any limitations imposed by all non-severe impairments when assessing the RFC.  20 CFR § 404.1545(a)(2).  This he did not do.  He simply ignored asthma as a potential workplace environmental limitation.  He also ignored the fact that Dr. Robinson noted Allen's smoking (Tr. 293), yet still determined that her history of asthma required her to "avoid dusty, poorly ventilated environments."  Tr. 296.

18 -- FINDINGS AND RECOMMENDATION

To reject the limitations found by Dr. Robinson due to asthma, the ALJ also stated that Dr. Berner "found that there is no evidence to support . . . the environmental limitations for asthma." Tr. 35. The contrary opinion of a non-examining physician does not constitute a specific, legitimate reason to reject a treating or examining physician's opinion, but may constitute substantial evidence when it is consistent with other evidence in the record. *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001). Since Dr. Berner clearly erred with respect to the lack of evidence of asthma, his opinion cannot even be used as substantial evidence. Thus, Dr. Berner's contrary opinion is not a legitimate reason to reject Dr. Robinson's opinion regarding environmental limitations based on Allen's history of asthma.

In sum, the ALJ erred by rejecting the physical limitations imposed on Allen by Dr. Robinson.

## III.  **Mental Health Treatment Providers**

Allen also argues that the ALJ erred by rejecting the opinions expressed by the psychiatric nurse practitioners and mental health counselors who provided nearly all of her mental health treatment between September 2007 and November 2010. Those opinions are contained in questionnaire responses, Global Assessment of Functioning ("GAF") scores,[5] and other treatment notes.

Although not considered to be acceptable medical sources, therapists and nurse-practitioners are considered to be "other sources." 20 CFR  § 404.1513(d). The ALJ must consider "other source" testimony and provide "germane reasons" to reject it. *Molina v. Astrue*, 674 F3d 1104, 1114 (9th Cir 2012). Germane reasons for discrediting testimony include inconsistency with the medical evidence and testimony that "generally repeat[s]" the properly

---

[5] According to the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev., 2000) ("DSM-IV-TR"), the GAF reports the clinician's judgment of the individual's overall functioning.

discredited testimony of a claimant. *Bayliss*, 427 F3d at 1218; *Williams v. Astrue*, 493 Fed

App'x 866, 3 (9th Cir 2012).

A.    **Welch and Peterson**

Mary O. Welch, R.N., P.M.H.N.P., and Kirsten Peterson, M.A., Q.M.H.B., at Cascadia

Behavioral Healthcare provided mental health treatment to Allen starting in August 2009.

Tr. 319-94.  In November 2010, they completed a check-the-box questionnaire regarding Allen's

mental impairments.  Tr. 477-79.  That questionnaire rates as "poor" Allen's ability to:

(1) maintain regular attendance and be punctual within customary tolerances; (2) complete a

normal workday and workweeks without interruption from psychologically based symptoms at a

consistent pace without an unreasonable number and length of rest periods; (3) travel alone in

unfamiliar places; and (4) use public transportation.  Tr. 477-78.  As to the "overall severity" of

Allen's areas of functioning, Welch and Peterson marked boxes indicating that Allen has

"marked" restrictions of activities of daily living, "extreme" difficulties in maintaining social

functioning; and "marked" difficulties in maintaining concentration, persistence, or pace.

Tr. 478-79.  They also opined that Allen would miss an average of "3 or more" days of work per

month due to her mental impairment if she were to be employed full-time. Tr. 479.  As additional

comments, they noted that Allen's panic attacks "often interfere with her ability to attend

appointments due to being unable to take the bus alone" and "often has her son accompany her."

Tr. 479.

The ALJ gave "little weight" to the questionnaire completed by Welch and Peterson in

part because they are not qualified to make these determinations."  Tr. 36.  It is unclear what the

ALJ meant by this statement.  He is correct to the extent that Welch and Peterson are not

qualified to diagnose medically determinable impairments, but they certainly are qualified to

assess the severity of impairments and resulting limitations.  20 CFR § 404.1513(d)(1) ("In addition to evidence from the acceptable medical sources," evidence from other medical sources should be used to "show the severity of [a claimant's impairment(s) and how it affects [the claimant's] ability to work.").

However, the ALJ gave several other reasons to reject Welch's and Peterson's questionnaire, namely that  it "is contradicted by their own treatment notes,"  is "inconsistent with Dr. Starbird's consultative examination," "is largely based on [Allen's] subjective reports, and is not supported by detailed mental status examination reports."  Tr. 36.  Allen contends that none of these reasons are germane.

She first asserts that the ALJ failed to identify any material inconsistency between the questionnaire and the treatment notes.  In support, the ALJ referred specifically to Peterson's treatment notes that Allen "has attended appointments alone" as contradicting the questionnaire comment that she "cannot be alone due to panic attacks."  *Id.*  He also specifically referenced the treatment notes as showing that Allen "has the ability to manage her anxiety and depression even when under the environmental stressors they have listed as limitations."  *Id*.

With respect to attending appointments, Allen correctly points out that the ALJ mischaracterized the record.  The questionnaire does not state that Allen "cannot be alone due to panic attacks," but states only that Allen's panic attacks "often" interfere with her ability to attend appointments.  In addition, she correctly points out that Allen come unaccompanied to only two of about 40 scheduled sessions, once on an uncrowded bus (Tr. 349) and once walking alone from the train station (Tr. 366).  To that extent, the ALJ erred.

However, the ALJ also relied on the 2009-10 treatment notes as showing progress, as well as on other evidence in the record belying a finding of marked restrictions in activities of

daily living and extreme difficulties in maintaining social functioning. Tr. 33, 36. For example,

he cited the June 23, 2010 note when Allen "reported that her anxiety was manageable, she had a

fairly good mood despite stress caused by her son, her sleep was adequate, and her mental status

exam was normal." Tr. 33, 379. Moreover, Welch's initial treatment notes state that Allen had

no history of suicide attempts, a mildly impaired memory, and fair judgment with a GAF score

of 50.[6] Tr. 320. Peterson's initial treatment notes also indicated only moderate impairment of

function. Tr. 324-25. A year later in August and September 2010, Peterson still indicated a

moderate impairment of function, assessed a GAF score of 53,[7] and noted that treatment had

been helpful in the past with a good prognosis. Tr. 326-28. She further noted that Allen was

fully oriented, had goal-directed thoughts with unremarkable content, and had fair judgment and

good insight. Tr. 329. The record does not reveal why only a few months later, Welch and

Peterson radically changed their view and found Allen to be so severely limited that she could

not function. The ALJ rationally concluded that the treatment notes indicated a higher level of

mental functioning than the "check box" questionnaire answers. *See Crane v. Shalala*, 76 F3d

251, 253-54 (9th Cir 1996) (the ALJ properly rejected "check box" forms that did not provide

explanation of the bases of the questionnaire answers).

Allen complains that the ALJ's view of the record ignores other reports by Welch and

Peterson of Allen's anxiety, depressed mood and affect, and impaired concentration and insight.

Tr. 320, 369, 373, 375. The ALJ did not ignore these reports. He acknowledged that Allen

suffers from depression and anxiety, but concluded that they "wax and wane according to her

---

[6] A GAF score of 41-50 indicates that the patient has "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." DSM-IV-TR, p. 34.

[7] A GAF score of 51 – 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR, p. 34..

environmental stressors at the time." Tr. 33.  He pointed to evidence in the record supporting that conclusion.

The ALJ also assigned less weight to Welch's and Peterson's questionnaire because it "is largely based on [Allen's] subjective reports, and is not supported by detailed mental status examination reports." Tr. 36.  Although Welch and Peterson had the opportunity to observe Allen over the course of a year, they necessarily relied heavily on Allen's self-reports about her limitations.  As discussed above, the ALJ erred by discrediting Allen's subjective symptom reports.  Therefore, he could not simply reject Welch's and Peterson's reliance on Allen's subjective reports.  And even though the record does not reveal any detailed mental status examinations performed by them, their observations of Allen constitute substantive evidence.

The ALJ also concluded that Welch's and Peterson's questionnaire is contradicted by Dr. Starbird's report.  Tr. 36, 273-78.  Allen disputes any such contradiction.  First, she points out that Dr. Starbird examined Allen on February 17, 2009, months before Welch and Peterson began treating her in August 2009 and without reviewing the 2007-08 treatment records of Western Psychological & Counseling Services, P.C. ("Western Psychological").  Tr. 273.  Given that Dr. Starbird thoroughly interviewed, examined and tested Allen, her failure to review some prior treatment records is not a significant omission.  In addition, the record contains no reason to believe that Allen's history and presentation changed sufficiently between February and August 2009 so as to render Dr. Starbird's evaluation irrelevant.

Second, Allen asserts that many of Dr. Starbird's opinions and observations support, rather than contradict, many of those offered by Welch and Peterson.  Even if some consistencies exist, they are offset by inconsistencies.  Dr. Starbird noted that Allen exhibited no signs of anxiety, that her affect was "inconsistent with the content of her speech," and that she "seemed

very invested in her self-image as a person who is disabled." Tr. 276.  Dr. Starbird also opined

that Allen's concentration was "good," described her manner as "childlike," and considered

Allen's credibility to be "questionable" due to contradictions in her statements.  Tr. 276-77.

Although she concluded that Allen "is quite dependent on others, both financially and in terms of

day to day functioning," she found that dependency "to be strongly associated with her

characterological features" and "more related to emotional needs and not related to actual

physical capabilities."  Tr. 278.  These findings do not describe the severely limited person

described by Welch's and Peterson's questionnaire responses.

Finally, the ALJ specifically rejected the "poor" ratings by Welch and Peterson of Allen's

abilities to travel alone and to complete a normal workday as based on "speculation" and to

maintain regular attendance as "usually not due to mental or physical impairments, but rather

transportation issues or third parties."  Tr. 36.  They did not explain their conclusion that Allen

could not complete a normal workday.   However, they did comment that her panic attacks

"often interfere with her ability to attend appointments due to being unable to take the bus

alone."  Tr. 479.  Allen's inability to travel alone and reliably attend appointments is not based

on mere speculation by Welch and Peterson, but is based on their observations, and could well

interfere with a normal workday.  With respect to an inability to maintain regular attendance, the

ALJ's conclusion as to the usual cause is not supported by the record.  As noted by the ALJ, she

did cancelled some appointments due to transportation issues (forgetting bus pass, Tr. 346, 354)

or third parties (arrest after fight with boyfriend, Tr. 368; ill children, Tr. 367).  However, she

also cancelled or missed some appointments due to "not feeling safe to come into the

appointment alone" (Tr. 343) and "due to increased anxiety" (Tr. 355), and many times the

record simply fails to note the reason. Based on this record, it is not reasonable to opine as to the usual cause of Allen's inability to attend appointments.

In sum, the ALJ did provide some germane reasons to reject the questionnaire responses by Welch and Peterson that Allen is so severely limited that she could not function. However, he failed to provide germane reasons to reject their opinion that Allen has a poor ability to maintain regular attendance, be punctual within customary tolerances and travel alone in unfamiliar places.

### B.    **Van Riper, Eckman and Cox**

Nannette Van Riper, L.P.C., was Allen's counselor from September 2007 to December 2008 at Western Psychological. In September 2008, Van Riper completed a Mental Disorder Questionnaire Form which noted that Allen is "often accompanied to appointments" due to "anxiety issues (*i.e.* panic attacks)." Tr. 250. She also noted that Allen had a history of "not showing up for appointments and cancelling late" with "frequent transportation problems." *Id.* She assessed Allen's GAF score on multiple occasions, the majority of which were in the 50-54 range, indicating moderate symptoms. Tr. 397-423. Other treatment providers at Western Psychological, Larry Eckman, P.M.H.N.P., and Anne Cox, P.M.H.N.P., also assessed Allen's GAF score on numerous occasions between 2007 and 2009 as consistently in the 41-50 range, indicating serious symptoms. Tr. 429, 431, 433, 435, 437, 439-43, 461, 463, 465, 467, 469, 471, 473, 475.

The ALJ gave "limited weight" to Van Riper's initial GAF score of 43 and "more weight" to her later GAF scores as Allen showed improvement. Tr. 36. In support, he stated that the GAF score of 43 was assessed on intake and inconsistent with Van Riper listing Allen's "present risk of suicide as low, risk of self-injurious behavior as low, and risk of abuse/physical

violence as none." Tr. 35-36, 252. The ALJ did not explain why a GAF score of 43 is inconsistent with a low risk of these behaviors and apparently did not consider that it may be based either on serious symptoms or a serious functional impairment. However, the ALJ further noted that "[o]ver the next several months, treatment notes showed [Allen's] GAF score consistently rising, which one would expect with treatment" for over a year. Tr. 36. That reason is supported by the record.

Allen also takes issue with the ALJ's rejection of the GAF scores assessed by Eckman and Cox. The ALJ rejected them as "consistently much lower" than the GAF scores assessed "often . . . within a day or two" by Van Riper who treated Allen "more often." Tr. 36. This reason is supported by the record.

## IV.    **Remand**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id*.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be

required to find the claimant disabled were such evidence credited." *Id*. The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9th Cir 1991). The reviewing court declines to credit testimony when "an outstanding issue" remains. *Luna v. Astrue,* 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by rejecting Dr. Robinson's opinion concerning Allen's limited capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, avoidance of frequent reaching with her dominant right arm and avoidance of dusty, poorly ventilated environments. Thus, that opinion should be credited as true. *See Harman*, 211 F3d at 1179; *Smolen*, 80 F3d at 1281-83; *Varney v. Sec'y of Health & Human Servs.*, 859 F2d, 1396, 1398 (9th Cir 1988).

The ALJ also erred by finding Allen not fully credible as to her subjective symptoms due to her seizures and mental impairments. Accordingly, Allen's testimony should be credited.

Turning to the other two facets of the *Harman* inquiry, this court finds that outstanding issues need not be resolved before a determination of disability can be made, and that the record is clear that the ALJ would be required to find Allen disabled if the evidence is credited.

At step five, based on the testimony of a VE, the ALJ determined that Allen could perform jobs that exist in significant numbers in the national economy, including medium unskilled work as a dishwasher and laundry worker. Tr. 38. However, the ALJ omitted the limitations imposed by Dr. Robinson from his RFC and from his hypothetical question to the VE. Dr. Robinson's opinion limited Allen to light exertional work which is inconsistent with the medium exertional level jobs of dishwasher and laundry worker identified by the VE and

adopted by the ALJ at step five.  Since it is unknown what work Allen can perform with the limitations imposed by Dr. Robinson, further proceedings would normally be required for the ALJ to revise the RFC and make a determination at step five.

However, by crediting Allen's testimony, the manifestations of her seizures and mental impairments also must be considered.  As discussed above with respect to the opinions of the mental health counselors, Allen's anxiety and depression, combined with her seizures, causes her to miss or cancel appointments, not leave her apartment and generally not go anywhere unaccompanied.  The VE testified that being late to work an average of even two days per month would make it unlikely that Allen could sustain competitive employment.  Tr. 80.  As revealed in the record, Allen could not sustain her most recent job, even when she had an employer who compensated for her symptoms by walking her to and from work and by sending her home when she became overwhelmed to the point of yelling at customers.  Given her poor ability to  maintain regular attendance, be punctual within customary tolerances and travel alone in unfamiliar places, it is clear that Allen is not capable of performing any competitive employment.

## **RECOMMENDATION**

For the reasons discussed above, the Commissioner's decision that Allen is not disabled should be REVERSED AND REMANDED pursuant to Sentence Four of 42 USC § 405(g) for an award of benefits.

## **SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due by November 4, 2013.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 16th day of October, 2013.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge